IN THE SUPERIOR COURT OF DEKALB COUNTY
STATE OF GEORGIA

VIJAY K. VIG,                           )
                                        )
           Plaintiff,                   )
                                        )
vs.                                     )     Civil Action
                                        )
SATPAL K. SHIKH,                        )     File Number 09CV14915-3
RAJENDRAPAL K. SHIKH,                   )
GURCHARAN S. SHIKH,                     )
and ALL CARE DENTAL,                    )
P.C.,                                   )
                                        )
           Defendants.                  )     HEARING EXHIBITS

Exhibits in the proceedings heard before THE
HONORABLE CLARENCE F. SEELIGER, Judge, Superior
Court of DeKalb County, Division 3, sitting without a
jury, Monday, February 8, 2010, commencing at 11:41
a.m., in Courtroom 7-A, Judicial Tower, DeKalb County
Courthouse, Decatur, DeKalb County, Georgia.

APPEARANCE OF COUNSEL

For the Plaintiff:  JOSEPH A. CARRAGHER, JR., Esquire

For defendant S. Shikh:  LOUIS LEVENSON, Esquire

For the other defendants:  CLARK JONES-LEWIS, Esquire

The Court Reporter:  J Gary Proctor, CCR-B-259



# CONTENTS

Opening Statement by Mr. Garragher ................................ Page 4

Opening Statement by Mr. Levenson ............................. Page 12

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| VIJAY K. VIG | 15 | 39 | 79 | 81 |
| CHARLES REDHEAD | 89 | 95 | 98 | |
| SATPAL SHIKH | 99 | 127 | | |

Ruling by the Court ........................................................ Page 149

# EXHIBITS

| EXHIBIT | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| Plaintiff's | 1 | Documents | 24 | |
| Plaintiff's | 2 | Package | 148 | |
| Plaintiff's | 3 | Form | 79 | |
| Plaintiff's | 4 | Check | 80 | |
| Plaintiff's | 5 | List | 139 | |
| Defendant's | 1 | (Document) | 41 | |
| Defendant's | 2 | (Correspondence) | 42 | |
| Defendant's | 3 | | (44) | |
| Defendant's | 4 | Checks | 117 | |
| Defendant's | 5 | Document | 113 | |
| Defendant's | 6 | | | 114 |
| Defendant's | 7 | | | |
| Defendant's | 8 | | | |
| Defendant's | 9 | (Folder) | 126 | |
| Defendant's | 10 | Checks | 86 | |

1    P R O C E E D I N G S

2    [Discussion/activity off the record.]

3        THE COURT:  All right, this is the case of Vijay Vig

4    versus Doctor . . . Dr. Sheh . . . Shake – Shikh . . . I will

5    not pronounce the names . . . and All Care Dental, PC –

6    there are two . . . motions.  I think there's a motion for

7    temporary alimony . . . and I do see an ex-parte emergency

8    motion for appointment of receiver.

9        Which one do we want to take up first?

10       MR. GARRAGHER:  The alimony, I think, is . . .

11   most important.

12       THE COURT:  All right; and –

13       MR. GARRAGHER:  [Inaudible] –

14       THE COURT:  – I –

15       MR. GARRAGHER:  – [inaudible] –

16       THE COURT:  Will the parties share the cost of the

17   takedown?

18       MR. LEVENSON:  Yes, sir.  We'll be happy to either

19   pay all or part of the –

20       MR. GARRAGHER:  [Inaudible.]

21       MR. LEVENSON:  – takedown.

22       MR. GARRAGHER:  Fine – yes, sir.

23       THE COURT:  All right.  Very good.

24       MR. LEVENSON:  Judge, I'm . . . .

25       If I may, I . . . I have no knowledge of a motion

1    having been filed for the appointment of a receiver.  Nor
2    does the nisi seem to indicate that.

3         So I'm not prepared for that matter.

4         THE COURT:  (Speaks aside to the law clerk.)

5         THE LAW CLERK:  That's true, Your Honor.

6         THE COURT:  Hmm?

7         MR. GARRAGHER:  It's been pled – It was pled in
8    the –

9         THE LAW CLERK:  [Inaudible]...it's not on the
10   calendar for today.  It's my understanding that Ms. Holmes
11   talked to...[inaudible]...I believe; and he was supposed to
12   get back with her to get a rule nisi for...[inaudible].

13        THE COURT:  Okay; well, let's go ahead and take up
14   the alimony issue first, and then we'll . . . consider the
15   issue . . . whether or not I should consider the issue –

16        MR. LEVENSON:  Yes, sir.

17        THE COURT:  – of the restraining – the appointment
18   of a receiver.

19        All right, sir, go ahead.

20        MR. GARRAGHER:  Your Honor, Joe Garragher, for
21   Mr. Vig.

22        This is an unusual divorce case – I've not run into
23   one with more than one . . . defendant.

24        We're maintaining that the two other individual
25   defendants, and the corporation, with the plaintiff, had

1   worked in concert to diminish Mr. Vig's marital assets. By
2   taking money into India, to putting money in banks here
3   . . . from –

4   THE COURT:  You need to speak into that
5   microphone.

6   MR. GARRAGHER:  Oh, I'm sorry.

7   THE COURT:  If you can pull the thing closer to
8   you, that'd be fine.

9   MR. GARRAGHER:  (Relocates microphone.)
10   We maintain that all four defendants are acting
11   together to diminish – and have, in fact, diminished – Mr.
12   Vig's marital estate.

13   Mr. Vig and Dr. Shikh – who is his wife, and the
14   first-named defendant – were married about five years ago?
15   Dr. Shikh is a dentist.  Mr. Vig is now a dental
16   hygienist.  They have worked together and built a company
17   called All Care Dental, PC – professional corporation.  Of
18   which Mrs. Vig has given 40 percent – stock – to her
19   sister, Raj . . . I call her "Raj" but it's Rajendrapal, the
20   second one on the list here.  I don't think that's legal,
21   because I believe . . . in a professional corporation, to be a
22   stockholder, you have to be one of the professional people.

23   But in any event, she shows, even shows, on her
24   financial affidavit that 40 percent of that business, the
25   profits, go to the sister.  This is exactly what we're talking

1    about, diminishing his interests.

2        A house was purchased – out of foreclosure – for a
3    hundred and seventy – a hundred and eighty-five thousand
4    dollars cash.  It was placed in Mis'ess . . . Satpal . . .
5    Shikh's . . . name.

6        A house nextdoor was purchased a month later . . .
7    for some two hundred . . . $485,000 – there's . . . six
8    hundred . . . and twelve thousand dollars worth of cash
9    . . . in the two houses – that're adjacent to each other.

10       The second house that was purchased is their marital
11    residence, we maintain.  However, when she bought that,
12    she didn't invite Mr. Vig to the closing; but she put that
13    back house in the name of her sister.

14       So her sister, we maintain, the sister, and . . . and
15    Mis'ess . . . Shikh, both hold . . . property, in trust . . .
16    for Mr. Vig.  The money was bought with marital assets
17    . . . garnered from their business . . . put into the . . .
18    property – and the deed was in one name and deed was in
19    the other name but not his.

20       What we've got here is:  Mr. Vig, since December,
21    has been out of a house . . . no car . . . no food . . . no
22    maintenance . . . .  He's homeless.  He walks everywhere.

23       He's worked with her . . . even – even after they
24    separated . . . helping her out, at the clinics . . . .  They
25    work . . . long hours.  And she makes, we maintain,

1   grosses, $50,000 a year – a – a month.  And he . . . is
2   allowed to show that he makes 2,000 a month . . . which
3   he doesn't get.

4   What she does with him is she takes his paychecks,
5   sends him to the bank . . . has him cash them . . . and give
6   her the cash.

7   This was the – the big problem, in December.  He
8   took $4500 with her . . . to the bank . . . they cashed the
9   checks . . . 4500 . . . and he held out 3200 and gave her
10  1500 – as I understand what the figures were . . . and she
11  went kind of ballistic on that because she wanted all the
12  money.

13  And they had an altercation; there was some physical
14  violence . . . .  She and her sister threw him out of the
15  house – he's been out of the house . . . since then. – the
16  house in which his sister . . . his father-in-law . . . his
17  wife . . . and himself were all living.

18  In any event, we had asked for appointment of
19  receiver because now she's not taking care of the business.
20  [Unintelligible]...got . . . two clinics operating – one in
21  Covington . . . and one in Conyers – and they just bought
22  another one two weeks ago, or a week ago . . . also in
23  . . . Covington. – I believe it was.

24  So, they have three clinics; two are operating right
25  now.  And she moves from one to one and he moves one

1  to – they – they work late hours; they work . . .
2  unbelievable times . . . . But they make . . . a lot of
3  money.  Albeit, it's their business.
4       He's concerned because now Miss . . . Shikh has
5  taken the attitude that she won't work all the time there
6  . . . and . . . he can let the place go down the drain as far
7  as she's concerned . . . . She may sell the business and
8  move to India . . . . She may not work at all . . . .
9       As long as he's not getting anything, she's happy.
10  She's very pleased with that situation.
11       He has represented . . . she – himself in . . . two or
12  three personal suits . . . against suppliers and whatever . . .
13  Home Depot – in fact, one of the suits is in front of Your
14  Honor.  Which they have settled . . . for $4500 – but she
15  won't sign the check because he's going to get some of it.
16  That's a case in front of Your Honor.
17       There's another couple that're settled, the same way.
18  They have a $24,000 . . . X-ray machine . . . that . . . they
19  bought . . . for cash . . . and . . . then decided they didn't
20  want it.  She asked him, "Would you check with the
21  company?" – he worked it out and took some time . . .
22  worked it out where they said, "Yeah; well, we'll come
23  pick it up and give you the 24,000 back."
24       She won't play ball.  She will do nothing . . . to . . .
25  foster his advancement or help him.

1          She's been at . . . luncheons where she sits and eats

2    and he doesn't eat – because he doesn't have any money.

3          At home, they cook two different types of cooking.

4    One's Indian . . . and one's another type of Indian.  They

5    cook his . . . .  They cook their type . . . feed them . . .

6    and give him leftovers.  It's a horrible situation.

7          Of course, he has no . . . has no money to pay an

8    attorney so –

9          THE COURT:  Let me ask a question:  You're

10    saying – Has there been a violation of the standing order?

11          MR. GARRAGHER:  Has there been a – Yes, there

12    has.

13          THE COURT:  Okay.  Would you spell them out for

14    me.

15          MR. GARRAGHER:  Okay.  One of the violations is

16    she . . . she calls . . . numerous times, during the day,

17    whenever he's not available . . . around . . . she keeps

18    calling and calling and calling . . . and saying – you know,

19    asking him . . . either to come to work . . . or – or to drop

20    the lawsuit . . . or –

21          THE COURT:  Well, we're talking about – I'm

22    talking about assets being . . . manipulated.

23          You know, when the standing order goes in effect,

24    nobody's supposed to be fooling around with those assets.

25          MR. GARRAGHER:  Oh.  Since the filing of the

1    complaint, I don't know what's happened – I know what

2    happened before . . . .  I'm – I'm sure . . . the money's

3    been . . . .  The sister's getting 40 percent of the

4    business –  that she shouldn't have a stock interest in at

5    all.  She did nothing to earn it.

6          The father – The money, he gets none of it – Let's

7    put it this way:  He gets zero dollars.  Zero.

8          Any money that's generated in the business – even

9    the 2,000 a month that's supposed to go to him – ends up

10   with Ms. Shikh . . . her father . . . and her sister.  Her

11   father, we understand, goes to India from time to time.  I

12   think the mother passed away, recently, and they all went

13   to India except him.

14         So, we don't know where the money is.  In this

15   complaint, I've asked for a hundred percent of those two

16   houses – cash out . . . predicated on the fact that if we

17   can't find out where the money goes . . . where the money

18   is – and there's a lot of it around . . . then I think he's

19   entitled to at least get something from here in the United

20   States.  We believe there's money in India.  We believe

21   there's money in other bank accounts . . . .  It just goes on

22   and on.

23         THE COURT:  Okay; well, what do you want me to

24   do?

25         MR. GARRAGHER:  I want you to give this man

1    $5,000 a month.  So he can get a car . . . can get a house
2    . . . can get some food . . . he can get some clothes . . .
3    he can live – he's not paying any attorney's fees; I'd like
4    you to give me $10,000.  But I know that's not going to
5    happen.

6         But, in any event, he has no money, and no means of
7    support, no way to get it.  He can get a job . . . possibly.
8    But, you know, he has no way to get to the interview.  He
9    doesn't have any wheels.

10        He walks . . . a mile or two . . . to the MARTA
11   station . . . and gets on the MARTA and gets on the bus
12   and comes out to my house.  Two hours.  I've taken him
13   home a couple of times.  Done that kind of thing.

14        But, it's . . . he's homeless – he tells me to take him
15   home . . . someplace in Decatur.  I –

16        THE COURT:  And –

17        MR. GARRAGHER:  – [inaudible] –

18        THE COURT:  – how do you intend to establish that
19   he's entitled to $5,000 a month?

20        MR. GARRAGHER:  He's got a . . . financial
21   affidavit.  Where – Where he's maintaining that he needs
22   to get a . . . a . . . a rental car . . . he needs to . . . buy
23   food, buy . . . situation.

24        He needs to get . . . a roof over his head . . . .
25   [Unintelligible.]  Got to get it.

1           And – And he just has nothing.  He's built this

2    business with her . . . and now it's being pulled from him.

3           And . . . .  And there's nothing in there – he's got

4    $25 in one bank account . . . $36 in another . . . and he

5    brought $36 to pay [inaudible] . . . .

6           THE COURT:  All right, sir.  Well, I'll hear . . . I'll

7    . . . hear your witnesses in a moment; I'd like to hear from

8    the defense.

9           MR. LEVENSON:  Thank you, Judge.  Louis

10    Levenson – and I'm going to be very, very brief; I'm going

11    to depend, more, on the evidence that's been presented.

12           I'm going to tell the Court, now, that the evidence

13    will be, without dispute, that this marriage was predicated

14    upon multiple frauds perpetrated by the plaintiff/petitioner

15    in this action.

16           Your Honor's authorized, pursuant to 19-6-3 . . . even

17    at a temporary hearing . . . to consider . . . that . . . the

18    . . . if the moving party is the cause of, or the

19    circumstances . . . ar– around the separation . . . rendering

20    alimony unnecessary, that you may consider that and, in

21    your discretion, you may refuse it altogether – I'm not

22    saying it's required, of course . . . .

23           Let me give you just a few . . . well . . . let me just

24    say this . . . because I want – I want . . . the Court to

25    resp– I – I think the Court should hear evidence from the

1     movant.

2          Multiple misrepresentations of fact were made by the
3     plaintiff to induce this marriage which was . . . a marriage
4     arranged through a service in India . . . on the Internet.

5          Facts were disclosed . . . facts suggested're true . . .
6     but information was disclosed by the petitioner which
7     were – was incorrect.  And we intend, when we have an
8     opportunity to get an answer together – which I think is
9     not due for another week, to . . . counterclaim for divorce
10    and/or annulment, on the grounds of fraud and . . . duress
11    . . . .  But . . . I realize that's not for Your Honor's
12    consideration today – with respect to the remedy they seek.

13         For a short period of time . . . the plaintiff/petitioner
14    was an employee of the doctor's dental clinic and was
15    being paid $2,000 a month for his services – when he
16    worked.  Which was very infrequently.  And . . . Judge,
17    the rest was money that was borrowed . . . or . . .
18    converted . . . by the plaintiff from the defendant's funds
19    . . . for gambling . . . and other . . . activities which were,
20    up until recently, not disclosed to the plaintiff.

21         I'll . . . point out one other thing on my client's
22    domestic relations financial affidavit – which I thought was
23    interesting when I saw it . . . .  She said . . . the date of
24    the marriage was February 14th, 2004, the date of the
25    separation was February 15th, 2004 – and I thought, "Well,

1    that's got to be a typographical mistake.  They can't

2    possibly have . . . separated the next day."  And she said,

3    the evidence will be, "We never lived together as husband

4    and wife."  And, in fact, never consummated the marriage.

5    And, in fact, because of the impotency of the plaintiff –

6    which Your Honor will . . . unfortunately, have to hear

7    some evidence about here today.

8         Thank you.

9         THE COURT:  Okay.

10        We're going to go ahead and break for lunch; and

11   we'll come back early, though.  We'll come back at 1:00

12   o'clock.

13        And we'll start hearing the evidence at that time.

14        MR. GARRAGHER:  Thank you, Judge.

15   [Whereupon, the above-styled matter was recessed for

16   lunch at 11:57 a.m., to recommence at 1:00 p.m. the

17   same day.]

18

19

20

21

22

23

24

25

1           A F T E R N O O N   S E S S I O N
2       [Commencing at 1:07 p.m.]
3           THE COURT:  All right, sir.
4           Mr. Garragher, are you ready to proceed?
5           MR. GARRAGHER:  Yes, sir.
6           I call Mr. Vijay Vig, the plaintiff, to the stand,
7       please.
8       Whereupon,
9                     VIJAY K. VIG
10      took the stand as a witness and, having first been
11      sworn/affirmed, was examined, and testified, as follows:
12                  DIRECT EXAMINATION
13          DEPUTY JENKINS:  State your name.
14          THE WITNESS:  My name is Vijay . . . K. Vig.
15  BY MR. GARRAGHER:
16      Q    Mr. Vig . . .
17      A    Yes, Mr. Garragher?
18      Q    . . . you . . . filled out a financial affidavit, for the
19  Court.
20      A    I did.
21      Q    In that affidavit, you indicated there's no income . . .
22      A    That's correct.  I have –
23      Q    [Inaudible] –
24      A    – no –
25      Q    – you –

1      A    – income.

2      Q    – explain that to the Judge, why there's no income.

3      [Pause.]

4      A    Judge, in nineteen – I mean, 2006 . . . January 19th,

5      or 20th . . . of 2006 . . . me and my wife, Dr. Satpal Shikh, a

6      defendant herein . . . opened a corporation, All Care Dental, PC.

7             In which she insisted that I give 40 percent interest –

8      right in the papers – to her sister, who's neither a dentist nor a

9      participant working in the clinic . . . and nor a participant in

10     investing any money into the clinic operations.

11            Unbeknown to me, the defendant chose to pay me

12     $24,000 a year, as income, for working in the clinic.

13            I have been working seven days a week, in the clinic,

14     at times sleeping in the clinic, so that we could see the patient

15     the very next day.

16            However, I have never gotten any money except

17     $3,300 that were paid to me in . . . to – on July . . . 31st, 2009.

18     And I've been living off of that.  And I have no money in my

19     pocket except $15 left.  And I have $36 in my account.  And

20     $25 in another account.

21     Q    And did you help Ms. Shikh, Dr. Shikh, to develop

22     the business, or build the business?

23     A    That business would not be sitting there, at the

24     location we're in – because she was turned down by the landlord

25     and the lease was initially signed in my name.  However, the

1   landlord insisted to have nom be – name be placed, in there . . .

2   because they wanted to make sure the doctor would be more able

3   to pay the lease payments than I would on my own.

4           Her credit wasn't good.  Mine was excellent.  I used

5   my credit to get our first apartment after the marriage.  I used

6   my credit to get the clinic . . . location . . . .  I used my credit

7   to get the second clinic location . . . .

8           I used my negotiations to get the third clinic, that

9   was paid for on July the – January the twenty- . . . -eighth . . .

10  of 2010.

11      Q    Did you ever invest any money of your own money in

12  that?

13      A    I took loans against my credit cards . . . and . . .

14  bought the construction material, paid the labor costs . . . to

15  several contractors and subcontractors . . . out of those proceeds

16  . . . and charged . . . the . . . construction material on my credit

17  cards.

18      Q    And did you live at that time in an apartment?  Or

19  where were you living then?

20      A    At that time, we were living in an apartment.

21      Q    And who was living there with you?

22      A    Me, and my wife.

23      Q    All right.

24           Subsequently, you decided to purchase a house.

25      A    Subsequently . . . .  I'm sorry.  Did you have –

1   Q And you purchased one, the first house you
2 purchased.

3   A The first house I purchased . . . I was . . . driving
4 around – because we were in search of house . . . and I saw
5 these two homes, next to each other . . . for foreclosure.  In July
6 of 2008.

7   And I mentioned to her, since looking for it:  "Why
8 don't we just take a look at these?"

9   She brought her brother with her . . . Dr. Churandee
10 Shikh . . . who came along . . . .  We saw the house . . . and
11 . . . we liked it . . . made an offer, paid . . . hundred eighty-five
12 thousand dollars cash . . . .  I went to the closing with her.
13 They took me with them.

14   However, it was deeded in her name only.  She's my
15 wife.  I had no problem with that, at the time.

16   And then, subsequently, I was told, by her father . . .
17 Mr. Gurcharan Shikh – who's also defendant in this case . . .
18 during one of our conversations . . . "You're welcome to live in
19 this house.  But this's not your house."

20   And that's the second house I'm talking about for
21 which . . . $427,000 in cash was paid.

22   Q How much?

23   A Four hundred twenty-seven thousand . . . .  I might
24 be . . . wrong . . . in the amount – but four twenty-two or four
25 twenty-seven.  I can't be certain.

1          And it was deeded in her sister's name, only.

2          Last year, my wife, Dr. Shikh, told me that . . . just

3    out of a . . . out of conversation – I had no knowledge of this

4    . . . that she has paid upwards of a hundred thousand dollars in

5    cash to her brother.  I don't know what for.

6     Q    You had no cash of your own at this time.

7          When –

8     A    I –

9     Q    – you bought the houses.

10    A    I'm sorry; could you –

11    Q    Did –

12    A    – repeat –

13    Q    – you have cash? – of your own, you put into the

14   houses.

15    A    I didn't have any cash to put in.

16    Q    Okay; so where did the cash come from?

17    A    My understanding is, it all came from the clinic's

18   operation, the income from the clinic.

19    Q    Okay.  And how much do you say that Mis'ess . . .

20   or – excuse me – Doctor . . . Shikh . . . earns . . . in the

21   clinics?

22    A    In 2008, I saw . . . some documents, from the

23   accountant.  It declared her income at $600,000.  And . . . that's

24   a year.

25          I don't know what was declared in 2009.  I have no

1    reason to believe it was any less than that.

2         Q    You said that you came to believe that they had

3    decided to pay you 2,000. You didn't know that from the

4    beginning?

5         A    Nobody ever told me.

6         Q    And where were you living?

7         A    I was living in the house – in our apartment. At the

8    time. With my wife.

9         Q    And how many clinics does All Care have?

10        A    Right now, there are three . . . dental clinics.

11        Q    And how many dentists?

12        [Pause.]

13        A    Dr. Shikh is the only dentist currently as I know it

14   today, as I sit here. But we had some dentists who came in and

15   worked while there was a . . . Dr. Shikh couldn't handle the

16   load of her . . . patients.

17        Q    You went to hygienist school?

18        A    I went to hygienist school.

19        Q    How long did that take?

20        A    That take me . . . . That took me about a year . . .

21   and . . . eight months, I believe.

22        Q    Did you help her before you went to school, and after

23   you went to school?

24        A    I helped from day one . . . from leasing the place . . .

25   to constructing the place . . . making it . . . for the codes . . . to

1     meet the codes, to operate the clinic . . . and worked as an
2     assistant . . . to her . . . although, at that time, I hadn't gone to
3     school for assisting.  But she guided me through that.  And
4     assisted.

5              When I went to school, I would – came – come
6     straight back to the clinic . . . and go to work . . . help her . . .
7     until I finished . . . my hygienist . . . curriculum.

8        Q    So you became a licensed hygienist in –
9        A    I –
10       Q    – [inaudible] –
11       A    – am a licensed hygienist.
12       Q    Are there any other hygienists in the clinic?
13       A    There are no other hygienists . . . by the clinic, the
14    . . . until the day I left.

15       Q    Now, there's been some talk that you have
16    represented the company in legal matters.  What is that all
17    about?

18       A    I have never represented . . . the company in legal
19    matters, except in the capacity of a resident agent for the
20    corporation. – in magistrate court . . . in Rockdale County . . .
21    where the judge . . . allowed . . . the company's repre– resident
22    agent . . . to . . . file the – the answers? – simple responses to
23    the patients' complaints.

24       Q    Can you describe some of the cases or the cases that
25    you now have . . . where you're working for you, and your

1    wife? . . .

2        A    Yes.

3        Q    . . . in cases? . . . to the Judge.

4        A    Yes.

5             We have a case . . . that is . . . us representing . . .

6    ourselves in pro se . . . in Your Honor's court . . . case against

7    Home Depot . . . for which Home Depot . . . myself . . . and my

8    wife . . . reached a settlement agreement . . . . I signed my

9    portion of the settlement. We're going through conflicts and

10   . . . fights . . . . She refused to sign it. Until this date, I don't

11   think she has signed it. – settlement agreement . . . and sent it

12   back to Home Depot. Because they're always calling the clinic,

13   looking for me. And I am no longer there.

14       Q    And they're ready to settle?

15       A    They've been ready to settle since December the 11th.

16   Or 12th.

17       Q    And that's a case before Judge Seeliger?

18       A    That is a case before Judge Seeliger.

19       Q    She won't sign.

20       A    She will not sign.

21       Q    Why?

22       A    I don't know her reason.

23            I think that it's a . . . .

24   [Pause.]

25            I guess you need to ask her those questions; I do not

1    know the reason why she wouldn't sign.

2            My understanding is that she . . . if she sees any

3    benefit to coming to me, in any way . . . she will not cooperate

4    with me.

5        Q    How about the other cases?

6        A    We have another case . . . also in pro se, in Gwinnett

7    County, against Specialty Furnishings, Inc.  We have reached a

8    settlement . . . in both cases . . . getting what she wanted . . .

9    but she will not even return those people's call– the attorneys'

10   calls . . . will not give me the message that the attorneys called

11   . . . and . . . there's a meeting set up between . . . those

12   attorneys . . . and us . . . to come and . . . sell the agreement

13   . . . with . . . settle the case . . . with the furnishings company's

14   owners.  And that is for tomorrow.

15       Q    So there're a couple of cases that you and Dr. Shikh,

16   your wife, are the plaintiffs.

17       A    Yes.

18            In pro se.

19       Q    All right.  And there's a couple of cases in which

20   . . . clients . . .

21       A    Yes.

22       Q    . . . patients . . . have . . . have brought suits.

23       A    Patients have brought suits . . .

24       Q    Now –

25       A    . . . in the magistrate court.

1  Q And you maintain that the magistrate judge –

2 somewhere – allows you to do that . . . for the corporation.

3  A That is correct.

4  Q I'm going to show you . . . .

5 [Discussion aside between Mr. Garragher and the court

6 reporter.]

7

8           [Whereupon, documents were

             marked as Plaintiff's Exhibit 1

9             for identification.]

10 BY MR. GARRAGHER:

11  Q I'm going to show you what's . . . one . . . two . . .

12 three . . . four . . . documents.  They're all marked P-1.

13    I wonder if you could just . . . quickly . . . give the

14 Judge a thumbnail sketch of what they are.

15 [Pause.]

16  A This is a letter from . . . Hobgood & Rutherford . . .

17 written by . . . Mr. David Rutherford, attorney, for Home Depot

18 . . . confirming that we are in agreement to settle this case, in

19 the amount of $4,500.

20  Q And that . . . the check is about to be drawn, but she

21 won't sign it?  Is that –

22  A She would not cooperate.

23  Q Okay.

24  A And this case is in the . . . Honor's.

25  Q This is the one in Judge Seeliger's court.

1      A     That is correct.

2      Q     The Home Depot, U.S.A., okay.

3      A     That is correct.

4      Q     What're the other three? – or four.

5  [Pause.]

6      A     This case –

7      Q     Are they certified copies?

8      A     These are certified copies, from the court.  Dated

9  February 4th, 2010.

10           This's an answer . . . that I, as a . . . resident agent

11  . . . for All Care Dental, filed in response to complain, by a

12  patie– by a . . . by . . . by a company . . . that filed a complaint

13  in magistrate court, for some doors that . . . at issue.

14     Q     What's the situation with that case?

15     A     That has been . . . dismissed, by the . . . superior

16  court . . . who . . . dismissed this case . . . .  We had a . . . we

17  have a corporate attorney named . . . Mr. Nix.  John Nix.  He

18  represented us in the . . . superior court.

19     Q     Was this a recovery or is this still sitting in limbo?

20     A     No; it's – the case's been dismissed.

21     Q     What about these (indicating)?  Now, you . . . as I

22  say, you represented them because they're . . . mainly, were . . .

23  cases either . . . against the corporation in the magistrate court –

24     A     That is correct.

25     Q     – or . . . brought by you...[unintelligible]...personally.

1      A    That is correct.

2      Q    Okay. Now, these . . . . Now, those show...

3  [inaudible]?

4      [Pause.]

5      A    No. This has also been disposed of – it's also

6  certified copies . . . .

7      Q    Well, what's this one (indicating)? This is one you

8  handled for them?

9      A    I handled it. And we filed an appeal in the superior

10  court. Before we had anything . . . to say about it . . . the . . .

11  plaintiff . . . [unintelligible]..."We don't wanna move forward"

12  . . . so . . . the . . . withdrew the case.

13      Q    Withdrawn.

14      A    Yeah.

15      Q    This one (indicating).

16      A    This . . . case . . .

17      Q    [Inaudible] –

18      A    . . . is –

19      Q    – [inaudible] –

20      A    – a current case . . . . There's an appeal . . . into

21  the superior court . . . of Rockdale County. And Dr. Shikh

22  would not let me talk to him. – Mr. Nix. So that he . . . might

23  charge us something . . . to represent in the superior court. And

24  there's nothing I can do about this case. Although . . . she

25  wanted to appeal it, because . . . she didn't like the award that

1      was given to the patient.  Which . . . $200 . . . more than what
2      the . . . what the . . . what the doctor said that . . . she owed
3      them.

4           Q     So this case is still in limbo?
5           A     It's pending . . . in the superior court . . . in
6      Rockdale County . . . where our attorney, Mr. Nix . . .
7      hopefully, will represent, on the day, the...[unintelligible] –
8           Q     It's a magistrate court case –
9           A     It –
10          Q     – brought –
11          A     – is –
12          Q     – by . . . clients –
13          A     [Inaudible] –
14          Q     – clients –
15          A     Yes.  Yes.  Patients in the . . . .
16          Q     So, right now, you've got a $4500 check hanging . . .
17          A     We do.
18          Q     . . . and . . . did you not, at one time, buy equipment
19     that's being returned?
20          [Pause.]
21          A     Yes.
22          Q     What is that about?
23          A     In December of 2008 . . . Doctor . . . needed to order
24     . . . a panoramic . . . X ray.
25                And it was paid, $24,000 cash . . . to a subsidiary of

1    . . . Kodak . . . Kodak Company.

2              The X ray is still sitting in the clinic, without being
3    used.  She asked me if I could call . . . the Kodak . . . and see
4    if they could pick it up.

5         Q     When was this?

6         A     That was back in . . . on, say, maybe . . . February?
7    . . . of last year.

8         Q     Okay.

9         A     I'm guessing the date, so please don't hold me to that
10   date.

11             And, after negotiating . . . for about . . . six months,
12   I would say . . . the vice-president of Kodak Company . . . went
13   and – and told me, "Okay.  We'll go ahead and send somebody,
14   and pick up the . . . X ray . . . and we'll send you the . . .
15   $24,000 check back."

16             And, about a week ago, my wife told me that the
17   transportation company has been calling . . . and calling . . . and
18   calling . . . to arrange a pickup . . . and...[unintelligible]...where
19   she hasn't honored . . . or picked up their calls . . . so they can
20   come pick up the X ray and return $24,000 –

21        Q     They're going to return 24,000 –

22        A     That is –

23        Q     – to –

24        A     – correct.

25        Q     – the company.

1      A      That's correct.

2      Q      Okay.

3             Were you involved with the Kroger lease?

4             MR. LEVENSON:  Judge, may I . . . may I just

5      interpose a general objection?

6             I don't understand the relevance of this insofar as

7      the issue of temporary support that is being sought by

8      this witness.  I realize it's his case, and he can present

9      it; but . . . I – I – we could go on, and essentially

10     attempt to try the issues in the divorce case – which,

11     we're not supposed to be trying here today.

12            THE COURT:  What's your response?

13            MR. GARRAGHER:  The response is, Your Honor,

14     that there's – there's . . . testimony coming up, or it's

15     been alleged, that he doesn't work for these people,

16     doesn't work for his wife, hasn't worked for her . . .

17     hasn't been paid, from the beginning.

18            We maintain he's worked for her.  And he put

19     together the business with her.  And he's entitled to 50

20     percent of the business, as a marital asset.  It's their

21     business.  They started it.  They built it.  Albeit, she's

22     the . . . the dentist . . . he's the hygienist.

23            But he – Now, she wants to go and take the

24     company, give her sister 40 percent of it . . . and . . .

25     say bye-bye to him.

1           I don't think it's right; I think he needs to have his
2    . . . his food paid for, his car paid for, his rent paid for
3    . . .

4           THE COURT:  Uh . . . .  All right; well . . . .
5           Are there any other lawsuits that he's been involved
6    with, on behalf of the company?

7    BY MR. GARRAGHER:

8        Q    Any others?

9        [Pause.]

10       A    There were some disposed of – they're all in
11   magistrate court . . . in Rockdale County.

12       Q    We talked about your . . . diminishment of your
13   estate, of your . . . your . . . marital estate.

14       A    Yes.

15       Q    Does Dr. Shikh pay any money over to her sister,
16   Raj?

17       [Pause.]

18       A    Every evening, either the cash that's generated from
19   the clinic goes to her father or to her sister.  From there, I don't
20   know where it goes.

21       Q    You've thought that possibly it goes to bank accounts
22   here or elsewhere?

23       [Pause.]

24       A    Yes.

25       Q    But you –

1       A    I –

2       Q    – don't –

3       A    – have reason to believe that.

4       Q    You don't get an accounting.

5       A    I get no accounting.

6       Q    Did Dr. Shikh close any bank accounts in which you

7    had an interest?

8       A    We opened an account . . . the Bank of America . . .

9    that was closed . . . and I'm guessing – I . . . nobody ever

10   asked me . . . I believe . . . it's closed; but if it's . . . still open

11   . . . it will have . . . a few dollars in it.

12              If it's still open.

13      Q    Are you saying that when you were acting as a dental

14   hygienist you helped her with . . . numerous . . . clients . . . in

15   her work?

16      A    All the hygiene . . . and . . . profy patients . . .

17   prophylaxis . . . patients . . .

18      Q    Was that cleaning?

19      A    . . . I was – Yes; that's dental cleaning.  General

20   cleaning.

21              I've been doing it . . . .

22      Q    To what do you attribute the fact that she doesn't pay

23   you anything?

24      [Pause.]

25      A    They are greedy.  The family is greedy.

1          They don't want to part with a penny.

2          They want everything controlled . . . by either herself

3    . . . and her sister and father . . . who have not contributed

4    anything . . . except caused this divorce.

5          Q      Causing your problems.

6          A      Causing problems.

7          Q      How do you eat?

8          [Pause.]

9          A      I have purchased . . . some . . . cans of food, on sale

10   . . . and I . . . open one up whenever I'm hungry.

11         Q      No car.

12         A      No car.

13         Q      No apartment, no roof.

14         A      No roof.

15         As a matter of fact, if I may, Mr. Garragher? . . . I

16   walk . . . everywhere. I [unintelligible] $15 . . . a week . . . I

17   spend on MARTA . . . so I can get to places, where I need to

18   go. And I have [unintelligible] . . . pairs of shoes . . . they

19   have nothing but holes in them.

20         Because I walk so much . . . . She leaves me, and

21   has left me . . . on the side of the road . . . during the day . . .

22   in the middle of the night . . . at 2:00 a.m. in the morning . . .

23   and 8:00 o'clock in the evening . . . you name it . . . she . . .

24   gets my keys . . . the office keys – "Gimme your home keys

25   . . . gimme the . . . key to the clinic . . . and gimme the key to

1    the car . . . and get the heck out of here."

2          And I walk miles and miles and miles and miles . . .
3    I cannot begin to the tell you.

4       Q    If you were to get an offer for a job, how would you
5    get there?

6       A    I would have to rely on walking and getting to
7    MARTA.  As a matter of fact, I was going to go to a place to
8    apply for a job.  I couldn't make it in time.

9       Q    You heard . . . I think, Judge Seeliger asked me . . .
10    in what manner did . . . you, or did she, violate . . . the
11    standing order.  Do you have any thoughts on that, how she
12    violated the order?

13       [Pause.]

14       A    About . . . two weeks . . . ago last Thursday, after
15    . . . the service had been . . . effected on . . . the defendants
16    . . . my wife called me to come to the office, and "help me,"
17    because . . . the landlord had locked up our . . . clinic – the . . .
18    C-4, which is suite number . . . in which we're expanding our
19    clinic . . . and in there is just about . . . four dental chairs . . .
20    and she told me about 12 to $14,000 worth of equipment . . .
21    and material, that Atlanta Dental Company . . . had left it there,
22    to place in our clinics.

23       Q    So she –

24       A    And . . . she . . . .  The minute I went there – She
25    said, "You've gotta come and talk to the landlord."  I said,

1    "Fine; I'll come there."

2           And the minute I got there, it was no conversation
3    about the landlord except . . . "Why are you taking me to
4    court?"

5           I said, "Dolly" . . . pardon me, Judge, that's a –
6    that's what she goes by.  I said, "Dolly, I have no place to live.
7    I have no money.  I haven't got shoes.  I have nothing.  You
8    claimed me . . . with the IRS, and state tax agencies, that you
9    pay me twenty- . . . -four thousand dollars a year.  But I get
10   nothing.

11          "I had to fight for . . . the three thousand . . . three
12   hundred dollars . . . that you pa– you . . . let me keep" –
13   actually, no; she didn't let me keep.  She wanted it.  Took me
14   home.  On the way, spat on my face.

15          Took me inside.  Fought with me.

16          Her sister comes up.  Grabs my back.  Wanted me to
17   take back...[unintelligible]...till I give the money.

18          I went back; I walked out.

19          Got on the bus, and went away.

20          I did not give her the $3300 back.

21   Q      I think you heard counsel for Miss . . . for Dr. – I'm
22   sorry – Dr. Shikh . . . mention something that . . . she alleges
23   that the wedding was on one day – and, I guess, on the 14th –
24   and then . . . ended on the 15th.  She's alleging there was no
25   marriage.  What do you say to that?

1    A    That is absolute lie.

2         THE WITNESS:  Judge, may I . . . get . . . some

3    water, if you would find it? . . . allow me to?

4         THE COURT:  Um-hmm.

5         THE WITNESS:  Thank you.

6    [Discussion/activity off the record.]

7         THE COURT:  Mr. Garragher, I have another

8    calendar coming in; I'd just like to call that calendar

9    . . . but we'll resume almost immediately, as soon as I

10   call it.

11        MR. GARRAGHER:  Yes, sir.

12   [Break from 1:35 p.m. to 1:38 p.m.]

13        THE COURT:  Okay, Mr. Garragher, I'm sorry for

14   the interruption; but we're ready –

15        MR. GARRAGHER:  That's –

16        THE COURT:  – to –

17        MR. GARRAGHER:  – fine –

18        THE COURT:  – proceed.

19        MR. GARRAGHER:  – [inaudible].

20   BY MR. GARRAGHER:

21   Q    Okay.  We were talking about the fact that, I think,

22   in your . . . in Dr. Shikh's . . . position, she maintains the . . .

23   wedding was one day and then it was the . . . the divorce was

24   the next day, so it . . . the marriage lasted one day, apparently.

25        And what would you say to that; did you consummate

1    this . . . marriage?

2         A    This marriage was consummated . . . at the Hyatt

3    Hotel . . . in downtown . . . after we had the . . . Indian cultural

4    wedding . . . a week after . . . we got married, by justice of the

5    peace, in Las Vegas, Nevada.  So there was no way this

6    marriage was over on the 15th, as the counsel for defendant has

7    represented to this court.

8         Q    And, when you had the Indian cultural wedding, how

9    many people showed up at that?

10        A    There must have been . . . upward of 200 people.

11        Q    All right.

12        A    I don't have the exact count.

13        Q    This is kind of touchy; but are you impotent?

14   [Pause.]

15        A    No, I'm not impotent.

16        Q    Well, I think there's been some allegations that maybe

17   you were – you didn't consummate because of that?

18        A    If I may, if the Judge will allow me to . . . explain, I

19   can certainly go into that.  And . . . the reason . . . that that

20   allegation is made . . . :  Right after the marriage . . . my

21   brother-in-law, Dr. Shikh, wanted us – and so did the family . . .

22   us, to produce children.

23             My wife has had . . . irregular . . . periods.

24             We went to Crawford Long Hospital, their . . .

25   fertility department . . . .  There were tests done.  Which

1  showed that she's the one who had the problem, in getting
2  pregnant, and my sperm count was perfectly fine.

3  Q  So, the wedding, or the marriage, has been
4  consummated.

5  A  Marriage has been consum– as a matter of fact . . .
6  before the marriage, in October of 2003, after she had come to
7  visit me . . . numerous times . . . in Nevada . . . I came here –
8  my flight got canceled . . . we stayed . . . and – I stayed at . . .
9  Crowne Plaza Hotel in Atlanta, by the airport . . . and . . . she
10  is the one . . . who forced me to stay there, with her. And . . .
11  for lack of better word, we consummated our relationship before
12  the marriage.

13  Q  Could you just . . . . We'll cut this down a little bit.
14  Could you just explain to the Court what your duties are –
15  hygienist – and what you did in the clinic.

16  [Pause.]

17  A  Well, as an assistant first . . . I helped . . . with
18  cleaning up the instruments, making the tray, for the patient –
19  for the doctor . . . put instruments on them . . . stood, on the
20  other side of the patient . . . hold and providing . . . instrument
21  to the doctor, as well as holding a suction, while the doctor's
22  working on the patient.

23  And, also, I also learned, from the hygiene school,
24  and helped the doctor, of making denture models. – taking
25  denture impressions . . . and . . . then . . . discard . . . the oral

1    tissues . . . and throwing the . . . the extracted teeth . . . clean

2    up the trays, clean up the operatories . . . and set it for the next

3    patient.

4           And as a hygienist . . . I . . . deep-cleaned . . . the

5    teeth – it's called "deep cleaning" – which is called "SRP," for

6    short. Which is . . . scaling . . . for . . . calculus.

7    Q    You have an idea of how many of those cleanings

8    you might've done? Rough?

9    A    Hundreds and hundreds and hundreds.

10    Q    All right. But you worked there every day.

11    A    Worked there every day, seven days a week . . . most

12    of the time, until . . . 8:00 p.m. Came in with my wife . . . left

13    with my wife . . . most of the time, except . . . when she

14    decided she didn't want me to be around. She left me in the

15    clinic. I stayed in the clinic, overnight . . . without taking the

16    shower the next day, except clean up . . . the best I could. And

17    she would go and visit her sister, and her father, leaving me all

18    alone, without any money . . . without . . . any –

19    THE COURT: All right –

20    BY MR. GARRAGHER:

21    A   – any –

22    THE COURT: – this is going too long, Mr.

23    Garragher.

24    MR. GARRAGHER: Okay. Okay.

25    THE COURT: So, I'll –

1              MR. GARRAGHER:  [Inaudible] –

2              THE COURT:  – ask –

3              MR. GARRAGHER:  – [inaudible].

4              THE COURT:  – you to finish up.

5         [Pause.]

6              MR. GARRAGHER:  That's all, Your Honor.

7              THE COURT:  All right.

8                   CROSS-EXAMINATION

9    BY MR. LEVENSON:

10        Q    Mr. Vig . . . .

11             MR. LEVENSON:  May I speak from where I am,

12        Your Honor?

13             THE COURT:  Yes, sir.

14             MR. LEVENSON:  Can Your Honor hear me all

15        right?

16             THE COURT:  I can hear you, if you keep that

17        microphone close by.

18             MR. LEVENSON:  Thank you, sir.

19             THE COURT:  Um-hmm.

20   BY MR. LEVENSON:

21        Q    Mr. Vig, good afternoon –

22        A    Good afternoon.

23        Q    Do you agree that you were entirely truthful with the

24   doctor when you agree– you and she agreed to be married?

25        A    Yes.

1        Q      In every respect.

2        A      In every respect.

3        Q      And you disclosed, to her, the things that were

4   important for her to know, relative to your history . . . financial,

5   physical . . . and otherwise.

6        A      I disclosed to her what she asked.  And I gave her

7   the answers, to her questions, and disclosed everything that was

8   important . . . for us to get married.

9        Q      Okay, very well, sir.  First, were you married before

10  February 14th, 2004?

11       A      No.

12       Q      Never been married before.

13       A      Never married before.

14       Q      All right, sir.  Not in any jurisdiction or country.

15       A      Not in any jurisdiction or any other country.

16       Q      Very well, sir.  What did you tell Dr. Shikh your age

17  was when you and she met and were engaged to be married?

18       A      I told her that my date of birth was January 3rd, 1954.

19  And . . . I showed my license, so that she would . . . see it.

20       Q      Let me show you a document – which I'm going to

21  mark Defendant's Exhibit Number 1 . . .

22       A      Sure.

23       Q      . . . for the purposes of helping refresh your

24  recollection.

25       A      Sure.

1        Q      (Presenting.)

2               Do you recognize that document?

3        [Pause.]

4        A      No.  I don't recog– I don't . . . recognize the

5        document.

6        Q      All right.  Do you recall dealing with a website . . .

7        in India . . . Shaadi- – S-h-a-a-d-i – -dot-com . . . through

8        which you and Dr. Shikh . . . met and became acquainted?

9        A      As a matter of fact, Dr. Shikh is the one who made

10       me aware that there was a page about me, on Shaadi.com . . . .

11       Q      Is the answer to the question yes, Shaadi.com is the

12       method by which you and she became acquainted?

13       A      Yes.

14       Q      Very well.  And, can you explain why they are

15       reflecting, from your e-mail account, that you disclosed your

16       date of birth was January the 3rd, 1965?

17       A      No, I do not.  Because I did not prepare this page.

18       Q      I understand, sir.  But your testimony here, under

19       oath, is that you never . . . from . . . your e-mail account,

20       Vijay7777@charter.net, indicated . . . that your date of birth was

21       January 3rd, 1965 . . . when you disclosed your personal

22       information to Shaadi- – S-h-a-a-d-i – -dot-com.

23       A      Never did that.

24       Q      Very well, sir.

25               Did you ever disclose to your . . . soon-to-be wife

1      that you were an attorney, licensed to practice law, with the firm

2      of Laub -- L-a-u-b -- & Laub, in Reno, Nevada?

3           A     Never did that – if she told you that, Counselor, that

4      is a total lie. As a matter of fact, I took her, on her very first

5      visit to me, to the law office and introduced her to everybody,

6      who was there, and told her I was a paralegal, working for them.

7           Q     Okay. Can you explain, then, why there's e-mail

8      correspondence between you and a Janie and Bill in which you

9      talk about helping them plan their estates, drafting their wills,

10     and making beneficiary changes to their will?

11          A     That would be under the direction of the lawyer at

12     Laub & Laub. And I would be working on the documents, as a

13     paralegal.

14          Q     Well, let me show you what I'm going to . . . mark

15     Defendant's 2 . . . to help refresh your recollection.

16            MR. LEVENSON: (Presenting.)

17         [Pause.]

18            MR. GARRAGHER: (Presenting.)

19            MR. LEVENSON: (Marking.)

20            May I approach, Your Honor?

21            THE COURT: Yes.

22     BY MR. LEVENSON:

23           Q     (Presenting.)

24            First, do you recall that correspondence with some

25     folks who are referred to as Janie and Bill?

1        [Pause.]

2        A    I don't recognize it. But the Janie and Bill, from my

3    recollection . . . now . . . were – and had been – the clients for

4    Laub & Laub.

5        Q    Okay. Can you explain to Judge Seeliger why you

6    would have been asked by Janie and Bill to send them a bill for

7    your wonderful and fast work?

8        A    That was not the legal work, Counsel.

9        Q    Okay.

10           What work was it, then, sir?

11       A    They were moving from Nevada to . . . I want to say

12    . . . somewhere east . . .

13       Q    Okay.

14       A    . . . and they asked me to do some research? . . .

15    because she had been working . . . for . . . Microsoft

16    Corporation and . . . Bill was a full-time preacher . . . . And I

17    did some research for them, to set up a business there. That's

18    what those bills were for.

19       Q    Okay.

20           So, in answer to my general question, you have never

21    misrepresented to your wife, before you were married or any

22    time thereafter, that you were an attorney at law, licensed to

23    practice.

24       A    Absolutely not.

25       Q    Very well, sir.

1                  Let me show you what I've marked Exhibit Number 3,

2     and ask you if you recognize this . . . .

3            (Presenting.)

4     [Pause.]

5            Do you recognize it?

6     [Pause.]

7     A    I recognize that.

8     Q    Very well, sir. What is meant by the question from

9    Tudor at Laub & Laub . . . the law firm . . . about, quote, "your

10   going underground in response to identity theft"?

11   [Pause.]

12    A    Tudor is a lawyer in . . . with Laub & Laub – or, at

13   least, he used to be.

14            What he said is that after I got married . . . .

15            Counselor, please listen to me. After I got married

16   . . .

17    Q    Yes, sir. I'm sorry.

18    A   . . . my wife . . . had . . . not let me contact

19   anybody, in my family . . . my friends, my associates, anybody I

20   worked with . . . about a month after I got married . . . and this

21   ...[unintelligible]...referring to . . . the, "Hey, you gone

22   underground? . . . and your identity has changed?"

23           And that's what he was referring to.

24    Q    Very well, sir. Did you disclose to your wife, in

25   exchange for loans that she made to you, both before and after

1      your marriage, that you owned 92 acres of land in Nevada which

2      would be sold . . . and the proceeds used to pay the debts . . .

3      that she had – that you had created with her?

4          [Pause.]

5          A    No.  Because, she had never loaned me anything.

6      Not one penny.  From . . . or before . . . our marriage.  And,

7      yes, I had told her I had 64.7 acres, roughly about that, the land,

8      that I owned, and I did own, at one time.

9          Q    Well, my question is:  Before you got married, in

10     February of 2004, did you represent to her that you owned real

11     estate in Nevada, 67 acres, 92 acres, whatever?

12         A    I told her I had owned it.  But, no, I never

13     represented anything else.

14         Q    So at the time of your marriage you did not own it.

15         A    At the time, I had lost that land.

16         Q    But you didn't tell her that?

17         A    She knew it.

18         Q    My question is:  Did you tell her that?

19         A    Yes.  I did.

20         Q    You're sure.

21         A    I'm positive.

22         Q    Okay.

23             Did you disclose to your wife that you had IRS liens

24     against you?

25         A    I said I might be exposed, to IRS liens, in the amount

1    of $250,000.

2              Before marriage.

3        Q    And what's the source of that $250,000 in IRS liens?

4        A    They had sent me some papers stating that I had an

5    income of two-point-some million dollars for the year. And I

6    looked up what the tax would be. I told her that it may be, but

7    "I'm not sure. I don't know what they're talking about. I will

8    get to the bottom of it and let you know."

9              And, as it happened, there was no $250,000 to be

10   paid.

11       Q    Sir, did you disclose to your wife before you got

12   married to her that you had this tax lien against you?

13       A    I did not tell her I had the tax lien; I said "might be

14   exposed to that."

15       Q    Okay. And afterwards, did in fact you mention to her

16   that you were obligated to the IRS to pay this lien off?

17       A    No.

18       Q    Did you, in fact, make payments to the Internal

19   Revenue Service?

20       [Pause.]

21            Af—

22       A    No.

23       Q    —ter you were married.

24       A    No.

25       Q    Because, according to your testimony, if I heard you

1     right, you were only getting, in the entire time you were

2     married, $3300 paid on July 31st, 2009. Isn't that what you

3     said?

4          A     That's . . . . That's right, July 31st, 'O9, yes.

5          Q     Thirty-three hundred dollars.

6          A     Thirty- . . . -three hundred dollars, that I put in my

7     pocket, after . . . she demanded the whole money back from me.

8          Q     Okay –

9          A     After she took me to the bank . . . and . . . I cashed

10     the check . . . . And th– This wasn't the first time, Counsel.

11     This had been going on throughout the marriage. She would

12     take me to the bank, take out three or four checks, at one time

13     . . . not every two weeks, as we were supposed to pay . . . or

14     every month . . . at one time . . . go cash the checks, and give

15     her the money. Well, she was my wife. She still is. And I . . .

16     obliged and gave it to her every time.

17          She's the doctor. She was the one who controlling

18     my life.

19          She would . . . threaten to kick me out of the house.

20     Kick me out of the business. Leave me . . . homeless – car . . .

21     carless.

22          And, yes, $3300 is what I got.

23          That's it.

24          That is it. –

25          Q     Okay.

1          A    – in 2009.

2          Q    Well, okay, I – I – I thought your . . . the question

3    and answer that you gave to the Court was that during the

4    marriage you received . . . $3300, from –

5          A    In –

6          Q    – her –

7          A    – payment – in the payroll . . . payments, yes.

8          Q    Were there any other amounts that she gave you

9    during that period?

10         A    If there was any amount, those are to purchase . . .

11   equipment for the clinic, and supplies for the clinic.

12              And . . . other things for the clinic that we needed

13   from time to time.

14         Q    Why would your wife need to wire to you in August

15   of 2006 $10,000 to your personal account?

16         A    Oh.

17         Q    In October, 2006, $3,000?  In November, 2007,

18   $3,000; in April of 2007, $1,000? . . . April, 2008, 37 . . . .

19   Shall I go on?

20         A    Absolutely.  Please go on.

21         Q    Three thousand dollars, October 10th, 2006 . . .

22   $3,000, November 7th, 2006; $3,000, December 8th, 2006 . . .

23   $3,000, January 29th, 2007 . . . plus . . . $808 net to you every

24   two weeks . . . for which checks are here (indicating) bearing

25   your endorsement.

1        [Pause.]

2        A     Counselor, if you notice . . . all those checks and
3    payments . . . as alleged by you, and my wife . . . were during
4    the marriage.

5            Now.  Those . . . payments made – or, wire-
6    transferred to me . . . were to pay . . . certain bills, that was
7    getting . . . that were incurred, during our marriage . . . and I
8    was getting the bills . . . at my Nevada address.

9            And those needed to be paid.

10       Q     But I thought you just told the Judge you only got
11   $3300 during that entire period.

12       A     Pay . . . payroll . . . in my . . . payroll tax, in my
13   hand . . . $3300.

14       Q     Okay.  All right.

15           MR. LEVENSON:  When the time comes, Judge, I'll
16           . . . mark all these exhibits, and not take up the Court's
17           time now doing it.

18   BY MR. LEVENSON:

19       Q     Mr. Vig, have you incurred credit . . . according to
20   your . . . according to your . . . your domestic relations financial
21   affidavit . . . you're carrying . . . Bank of America credit card
22   debt of $54,000; Wells Fargo, 29,000; American Express, 27,000;
23   U.S. Bank, 15,000 – that's . . . forty-two . . . a hundred – that's
24   about a hundred and twenty-five thousand dollars – does that
25   sound approximately correct, sir.

1       A    That sounds about right.

2       Q    Okay.  And whose credit cards are those?

3       A    Those are my credit cards.

4       Q    Okay.  And how does . . . what did you . . . how did
5    you incur this debt?

6       A    That was during the construction period for the clinic,
7    as I mentioned earlier, Counselor.  And they were . . . most of
8    them . . . were for purchasing construction materials, paying the
9    contracted labor . . . on daily basis . . . weekly basis . . . and
10   electrician . . . and you name it.  Those are paid out of those.

11      Q    Okay; so let's make sure we're clear.  This hundred-
12   and-some-odd thousand dollars that is currently on your . . .
13   schedule . . . are charges that relate to the construction of All
14   Care Dental; is that your testimony?

15      A    Most of it, yes.

16      Q    Well does . . .

17      A    Most of the amount that you're talking about.

18      Q    And how long has it been carried as a payable on
19   your credit card, how long?

20      A    Since . . . .  Since my wife . . . left . . . for India,
21   with her family . . .

22      Q    Well . . .

23      A    . . . for her mother – after her –

24      Q    The Judge –

25      A    – mother's death.

1     Q     The Judge doesn't know when that is.  When –

2     A     That was in April of – March or April of 2007.

3     Q     Okay.  When was the clinic finished?

4     A     It was finished in September of 2007.

5     Q     Okay.  So these charges've been on your card ever

6  since 2007.

7     A     That is correct.

8     Q     And who has been servicing the monthly . . .

9  minimum payments on that card?

10    A     Well, she'd been paying it, until about . . . and, some

11  of it, I've been paying it . . . until . . . I want to say January

12  . . . or February, of 2008 – which is about five or six, or 10,

13  months . . . after they were incurred.

14    Q     Mr. Vig, do you have any information for this court

15  as to why you placed on here (indicating) that all the payments

16  were made by you?  You . . . like me to show you the . . . the

17  affidavit you . . . you –

18    A     Sure.

19    Q     – signed?

20    A     Sure.

21    Q     It says "plaintiff" – that's you, correct?

22    A     Sure.  That's –

23    Q     [Inaudible] –

24    A     – me.

25    Q     – [inaudible].  Okay.

1           So if you – if you've only got $3300 . . . in amounts
2   received, how have you paid . . . and serviced the debt, on a
3   hundred and fifty thousand dollars in credit card charges?
4           From you.
5       A    Counsel.  That was for the clinic.  She made . . .
6   most of the payments . . . to my credit cards.
7           Didn't pay me . . . for my paycheck.  She made the
8   payments . . . gave me the money to make the payments . . . and
9   I did that out of the proceeds . . . she gave me.
10          She stopped paying it in January of '08.  And guess
11  what?  I came into this marriage with a perfect credit.  I have
12  zero credit today.  Because of . . . my wife.
13      Q    So this was just a typographical mistake.  You . . . in
14  fact . . . your wife is making these payments . . . on these cards,
15  since –
16      A    No.
17      Q    – '08.
18      A    I was making the payments . . . .  She would pay me,
19  and I would make the payments.
20      Q    Can you explain to the Court why your wife would
21  write checks for advances to you when the charges are legitimate
22  expenses of All Care Dental, and therefore deductible by All
23  Care Dental?
24      A    Absolutely.  Because the car– credit card charges
25  were under my name.

1      And she wanted to make sure that I paid it.

2      As a matter of fact, she paid me three thousand . . .

3   something-hundred dollars . . . to . . . close out one account. –

4   that I had carried in my name. – back in 2006 or the . . . early

5   seven . . . .

6      Q    Are . . . . And I want you to think carefully about

7   this, please, Mr. Vig; are any of the these charges on the credit

8   card related to gambling obligations that you have incurred?

9      [Pause.]

10     A    There might be some . . . that were incurred, as a

11  gambling . . . by both of us, my wife and myself.

12     Q    Can you give the Judge . . . an instance when your

13  wife and you incurred a gambling obligation, when your wife

14  signed . . . what's the word I'm looking for? . . . "marker" . . .

15  or "chit," for any gambling?  Give the Court any date – time,

16  place – when that occurred.

17     A    She did not sign anything.  However, I had . . .

18  gotten what you call a "player's card" . . . and I put it in there

19  . . . and she would gamble . . . at the same time as I would.

20     Q    Okay.  So with no income . . . and no money, you

21  have been able to gamble . . . .  What is the amount of the debt

22  that you have incurred, gambling, unrelated to the funds needed

23  to pay the All Care Dental . . . charges on the credit cards?

24     A    Counsel, I never said I had no income from any other

25  source.  Remember, I was still working . . . in the beginning of

1    our marriage . . . in . . . Nevada.  While I went there.

2            That's the source.  Partly.

3      Q   What's the other source?

4    [Pause.]

5            What other source, then?

6      A   That was the source – and I would charge a . . . I

7    mean, I would pay, out of my account . . .

8      Q   What other source of income, sir?

9    [Pause.]

10      A   They weren't paying me anything.  That was the

11   source of income that I paid.

12     Q   Did you disclose to your wife at the time of your

13  marriage that you had stock, that you were going to liquidate, to

14  contribute to this marriage?

15     A   Never said that.

16     Q   Okay.

17          Do you currently have in your possession any credit

18  cards that are in your wife's name that are based on her

19  obligation to pay?

20     A   No.

21     Q   So you wouldn't have any objection, then, as part of

22  the temporary order, that this Court may enter, to surrendering

23  those credit cards to either the Court . . . to your lawyer, or to

24  me, because you don't have any that would be . . . would create

25  an obligation upon your wife?

Case 1:11-cv-04487-WSD   Document 42   Filed 08/29/12   Page 55 of 65

1      A      That is correct.

2      Q      Have you ever signed your wife's name, to any credit

3   card . . . charges?

4      A      No.

5      Q      You understand what I mean by "signing her

6   name"? – writing or signing her name, Satpal Shikh.

7      A      Yes.  To answer your question, yes.

8      Q      Yes –

9      A      And –

10     Q      – what?

11     A      And, yes, I signed it, for the supplies, for the clinic.

12   She had authorized me to use the credit card, to purchase things

13   . . . from . . . from different stores . . . .  For example, napkins

14   . . . paper towels . . . .

15            And, yes . . . to answer your question, yes, I have

16   signed . . . her card . . . to purchase the things . . . for the

17   clinic, and few things she authorized to purchase for myself.

18     Q      Did you and your wife discuss her desire to have

19   children at the time you and she married?

20   [Pause.]

21     A      Yeah – we both wanted children.

22     Q      Okay.  And, she at the time of the marriage was . . .

23   how old?

24     A      She was . . . 39, approaching for- . . . 40.

25     Q      And how old were you at the time of the mar--

1      A      [Inaudible] –

2      Q      –riage?

3      A      – 50.

4      Q      Okay.  And . . . .

5             Isn't it true that you and she even discussed the

6      names of the children that you were going to . . . create, through

7      your marriage?

8      A      No.

9      Q      Okay.

10            And, did you disclose to her, at that time, at the time

11     of your marriage, that you were not capable of creating children?

12     [Pause.]

13     A      If you heard that, that'd be a total lie.  I did not tell

14     her that.

15            As a matter of fact, as I already testified, Counselor

16     . . . that . . . there was tests done . . . at Crawford Long . . .

17     where I was . . . deemed to be . . . fine, and she had the

18     problems with her period.

19            And she was instructed to do certain things.  But she

20     never followed.

21     Q      Dr. Stephen C. Jacob, MD . . .

22     A      Yes.

23     Q      . . . Boston Medical Group . . .

24     A      Yes.

25     Q      . . . are you seeing that physician?

| | | |
|---|---|---|
| 1 | A | I'm not seeing him now. |
| 2 | Q | Have you seen him, sir? |
| 3 | A | I saw him. |
| 4 | Q | What were you seeing him for? |

5       A    I was under depression, because of constant fighting
6  in the house. And I said . . . "My wife . . . wants . . . to have
7  sex with me, every night . . . and . . . I can't – I am under
8  stress." He said, "Why don't come in and . . . try this?"
9          And I did.

| | | |
|---|---|---|
| 10 | Q | What did he ask you to try? |
| 11 | A | He gave me some injections. |
| 12 | Q | Gave you . . injections – |
| 13 | A | Injections.  Yes. |
| 14 | Q | He . . . the doctor . . . Dr. Jacobs was giving you |

15  . . . syringes for you to self-inject?

| | | |
|---|---|---|
| 16 | A | Yes. |
| 17 | Q | For depression? |

18       A    Well . . . the la– the . . . sexual dysfunction or . . .
19  the . . . not being able to do every night . . . to . . . alleviate –
20  he said there was a . . . a problem with some blood flow. And
21  . . . "your depression" was causing that.
22         But, he said, "Try these." So I did.

23       Q    Well, I don't mean to be too graphic, Mr. Vig, but
24  . . .

25       A    That was –

1      Q   . . . [inaudible] –

2      A   – my –

3      Q   – [inaudible] you treat– being treated by Doctor . . .

4   Jacob for depression or were you being treated by Dr. Jacob . . .

5   for sexual dysfunction?

6      [Pause.]

7      A   This medicine was to arouse me . . . that . . . I had

8   . . . gotten to the situation because of the depression.

9      Q   I see.

10

11      And, it's your testimony that that problem did not

12   predate your marriage . . . with Dr. Shikh.

       A   That would be a true statement . . . . I urge you to

13   please look at the date on that . . . particular . . . document

14   from . . . the doc.

15      Q   Tell the Court what you want here, Mr. Vig. Let's

16   try to get to the particulars. What is it you're asking this court

17   to do for you here today?

18      [Pause.]

19      A   I think my attorney has outlined it pretty well.

20      Q   Well . . . .

21      MR. LEVENSON: Your Honor, I would ask . . .

22   that . . . you direct the witness –

23      THE COURT: Answer the question.

24   BY MR. LEVENSON:

25      [Pause.]

1     A   I . . . do not have any money. I work . . . . I start
2   the clinic . . . work in the clinic . . . until January 28th –
3   January . . . 28th . . . 2010.

4     Q   Okay. All right, so, what –

5     A   And I haven't been able to pay my bills, because I
6   don't get paid.

7     Q   Okay. But, according to your testimony, you were
8   never paid. Isn't that right?

9     A   No. The only time I was paid . . . when she . . .
10  gave me the checks . . . took me to the bank . . . had them sign
11  it . . . get the cash. And she will get the cash back. Otherwise,
12  I'd be thrown out of the house.

13     Q   Okay; but – but what I think you're saying is, you
14  never got the money . . .

15     A   That is correct.

16     Q   Okay. Well, then, what is the specific amount that
17  you seek for your temporary support until all these issues that
18  you claim can be sorted out? What is the amount, and the basis
19  for that amount?

20      Do you need a place to stay, sir?

21     A   I need a place to stay.

22     Q   Okay. Let's talk –

23     A   [Inaudible] –

24     Q   – about that. Let's –

25     A   [Inaudible] –

1      Q   – talk about that.

2      A   Yes –

3      Q   Have you sought a place to stay?

4      [Pause.]

5      A   I have looked into it . . . .

6      Q   Okay.

7      A   And –

8      Q   How much does it cost?

9      A   About $1200 a month.

10     Q   Twelve hundred.  Tell us about the name of the place

11  that you've found for you to stay.

12     A   I don't know the name but it's in . . . by . . . North

13  Druid Hills.

14       In –

15     Q   Is –

16     A   – Atlanta.

17     Q   – that a rental apartment or a home?

18     A   It's a condominium.

19     Q   Condominium.

20     A   Yes.

21     Q   Okay.

22       Is that a single bedroom . . . I mean, a one-bedroom

23  . . . condo, or two-bedroom?

24     A   I believe it's a . . . one-bedroom, with one-and-a-half

25  bath.

1    Q    Okay.  And is that for you to live alone, sir?

2    A    That's for me to live –

3    Q    Okay.

4    A    – alone.

5    Q    So, are you asking the Court to award you support so

6    you can pay your rental fee?

7    A    Absolutely.

8    Q    Very good.

9         What else?

10   [Pause.]

11   A    I . . . don't have . . . the car.

12   Q    Okay.  In fact, you had a car, that was . . . Dr.

13   Shikh's car, but it was stolen; isn't that right?

14   [Pause.]

15   A    That is correct.

16   Q    Okay.  So she was providing you with a car, until it

17   was stolen while in your possession.

18   A    That –

19   Q    Correct?

20   A    That is correct.

21   Q    Okay.  What have you done to recover the car back,

22   from . . . either the insurance proceeds or from whoever stole it,

23   so that you would then have transportation?

24   [Pause.]

25   A    The insurance company . . . I've been dealing with

1        . . . Allstate.

2                They had called . . . for Dr. Shikh . . . and me . . .
3        to come there . . . with the title of the car.  Which, they did not
4        find on time.  So we didn't go.

5                They've been calling.

6                They've written for Dr. Shikh.

7                That . . . "Because you haven't answered our calls,
8        we are going to close this claim."  Matter of fact, that's what
9        she told me.

10               So, unless she cooperates, I cannot call anybody –
11       because all the papers, all the phone numbers, all the contacts,
12       all the addresses, are in the clinic.

13       Q       Okay, sir.  So . . . when was the car stolen, to be
14       specific?

15          [Pause.]

16       A       I believe it was . . . February of two thousand and
17       . . . eight or . . . nine, maybe.

18       Q       About one year ago –

19       A       One . . . .  About a year ago, yes.

20       Q       Okay.  And in the last year, how have you . . . been
21       able to transport yourself to the point where you work every day
22       . . . seven days a week, like – like you said?

23               How've you been able to do that?

24       A       Most of the . . . as a matter of fact, all the time,
25       when I worked . . . went with her . . . in her car, from the home

1    . . . got into her car, I drove, she sat in the . . . passenger seat

2    . . . went to the clinic, in the evening, came back.

3        Q    Have you looked into what it would cost to lease or

4    finance an automobile, an economical automobile, so that you

5    could . . . transport yourself . . . to and from . . . home and

6    work?

7        A    Yes, I have.

8        Q    What is the cost for that?

9        A    The leasing . . . downpayment for leasing is about

10   $3200.

11          And monthly payment is about $430, $425, I believe.

12       Q    Four hundred and . . . $3200 downpayment?

13       A    Yeah –

14       Q    What kind of car is that?

15       A    It's . . . I believe it was Toyota . . . or Nissan – I

16   forget which one it was.

17       Q    Did you say, a minute ago, you had perfect credit?

18       A    I did.

19          I –

20       Q    [Inaudible] –

21       A    – did.

22       Q    Okay.

23       A    So –

24       Q    [Inaudible] –

25       A    – that's how I got the clinic . . . to be . . . approved

1    in my name . . . and that's how I got . . . the apartment
2    approved in my name.

3         Q     While we're on the subject of the clinic . . . if the
4    Court will indulge me . . . you prepared the – you prepared the
5    articles of incorporation for the entity known as All Care Dental,
6    PC; isn't that correct?

7         A     I did.

8         Q     And that's . . . if I may . . . approach, again, Your
9    Honor . . . thi– this is the . . . this is a copy of the articles
10   (indicating), is it not?

11        A     It is.

12        Q     Okay.  And you were complaining just a few moments
13   ago to the Court . . . about the fact that Dr. Shikh had done
14   something unlawful by placing 40 percent of the stock in her
15   sister's name . . . who you refer to as "Raj"; correct?

16        A     That is correct.

17        Q     But you drafted the document, didn't you?

18        A     I did.

19              Would you like an answer to that, Counsel?

20        Q     Well, yes –

21        A     [Inaudible] –

22        Q     – [inaudible] –

23        A     – [inaudible] –

24        Q     – [inaudible].

25        A     Whe– When . . . I prepared the document . . . either

1   there was going to be clinic . . . with her sister involved in it

2   . . . and getting an interest . . . or there wasn't going to be any

3   clinic.

4            I was married.  She was married.  She was

5   professional . . . .  I was going to be, because she told me she

6   wanted to . . . either get the . . . hygienist license . . . it was

7   our business . . . but she said there wasn't going to be any "our

8   business" . . . if I didn't include her name.  And, I'll get thrown

9   out of the house.

10           "So get going."  And I did that under . . . pressure

11  from her.

12      Q    And you became licensed as a hygienist when, sir?

13      A    Two thousand and eight. – two thousand – January,

14  2009.

15      Q    Okay; and, prior to that time – or . . . like you told

16  Mr. Garragher, you were in school for about 18 months, or so;

17  correct?

18      A    Correct.

19      Q    And during that period of time, you were getting

20  these paychecks . . . that you say you never got the cash from.

21  Correct?

22      A    No.  I wasn't getting any paychecks.  I might've

23  gotten . . . few.

24           And that cashed.  And given back to her.

25      Q    So, if I understand your testimony, you were getting a